Opinion issued April 25, 2023



In The

# Court of Appeals

For The

# First District of Texas

————————————————

## NO. 01-22-00121-CV

————————————————

**RICK RIVAS, Appellant**

**V.**

**LAKE SHORE HARBOUR COMMUNITY ASSOCIATION, Appellee**

On Appeal from the 458th District Court
Fort Bend County, Texas
Trial Court Case No. 21-DCV-288460

## MEMORANDUM OPINION

Appellee Lake Shore Harbour Community Association filed suit against several defendants, including Appellant Rick Rivas ("Rivas"), concerning the design and condition of the bulkhead system surrounding three man-made lakes at the Lake Shore Harbour subdivision in Missouri City, Texas. Rivas appeals from

an interlocutory order denying his motion to dismiss filed under Chapter 27 of the Texas Civil Practice and Remedies Code, also known as the Texas Citizens' Participation Act, in which he sought to dismiss Appellee's claims against him .

In two issues, Rivas argues the trial court erred in denying his motion to dismiss and in denying his request for attorney's fees because Appellee's legal action against him is based on or in response to his right of free speech and his right of association. We affirm the trial court's order.

## Background

The underlying lawsuit stems from the alleged "deterioration and misconstruction and post failure of the bulkhead[] system" surrounding three man-made lakes at the Lake Shore Harbour subdivision in Missouri City, Texas. Appellee, the Lake Shore Harbour Community Association ("Lake Shore" or "Lake Shore Association"), filed suit against Rivas and several other defendants,[1] claiming they failed to disclose significant problems with the bulkhead system and took no corrective action to remedy the problems. As it concerns Rivas, Lake Shore filed claims against him for negligent misrepresentation, fraud and fraudulent misrepresentation, constructive fraud, and breach of fiduciary duty.

---

[1] Lake Shore also sued Greatmark International, Inc., Vickburg Estates, Ltd., Skymark Development Co., Amvest Properties, Inc., Clinton Wong, Eric Ungar, Missouri City, Principal Management Group of Houston, R.G Miller Engineers, D&W Construction, Inc., and Addicks Services, Inc. Those parties are not involved in this appeal.

2

## A.     The Lake Shore Subdivision

The Lake Shore Harbour subdivision ("Subdivision") is a 270-acre planned community in Missouri City, Texas.  It has more than 900 single-family homes, most of which are waterfront lots.  Greatmark International, Inc., Vicksburg Estates Ltd., Skymark Development Co., Amvest Properties, and Clinton Wong (collectively, "Developer") were the developers of the Subdivision.

Construction of the Subdivision began in 2003.  According to Lake Shore, the "plan was to construct three large man-made lakes which would serve as the centerpiece of the development and would entice prospective homeowners to buy into this community because this community would have 65 acres of lake front property."  The lakes were to be enclosed with 45,150 feet of 12-inch concrete bulkheads "to buttress the concrete separating the [l]akes from the shoreline."

The Lake Shore Association was created in 2004.  At the time of its incorporation, the Lake Shore Association was controlled by a five-member Board of Directors ("HOA Board"), including Clinton Wong ("Wong"), one of the Subdivision's developers.[2]  According to Lake Shore, what "transpired during the next approximately 10 years was a concerted effort" by the Developer and its "affiliated entities, agents, and employees to conceal the significance of the construction defects" of the bulkhead system "as well as the forecast provided by

---

[2]     The Lake Shore Association's five-member board of directors consisted of Wong and four of his employees.

engineers to the Developer-controlled Board that there would be continued deterioration of the bulkhead system." Lake Shore alleges that "neither Wong nor any of his agents . . . told the Lake Shore Harbour Community about any significant problems with the bulkead[] system" until 2019, when the HOA Board announced for the first time that there were significant problems with the bulkhead system and the community would have to bear the costs of repairs.

According to Lake Shore, the Developer controlled the HOA from 2004 to 2021, until, when after much concerted effort, the "Developer finally allowed an election in January of 2021" enabling the homeowners "to take control of the [HOA] Board."

## B. Problems with the Bulkhead System

In 2016, the HOA Board commissioned Professional Engineering Inspections, Inc. ("PEI") to inspect and evaluate the performance of the bulkhead system at the Subdivision. PEI performed the inspection and prepared a comprehensive report "detailing the severity of the problems with the bulkhead systems." Lake Shore alleges that the PEI report described "significant deterioration of the bulkhead systems and evidence of soil erosion across all phases of the lake construction project." The PEI report stated that "more invasive engineering and soil testing would be necessary to determine the feasibility of repairs or the possible need for complete replacement." In response, Lake Shore

4

alleges that the "Developer-controlled Board" did nothing. The HOA Board took no "action to remedy the problems or implement PEI's recommendations." According to Lake Shore, the HOA Board "concealed the PEI report from the Lake Shore Harbour Community for more than three and a half years."

In 2017, Reserve Advisors, Inc. prepared another report ("Reserve Report") concerning the bulkhead system at the Subdivision. According to Lake Shore, the "Reserve Report relied upon the 2016 PEI report in confirming that extensive bulkhead repairs would be necessary" and further "recommended [that] an invasive engineering investigation be performed." Once again, Lake Shore claims the HOA Board did nothing. Lake Shore alleges that the HOA Board "took no action to remedy the problems detailed in the Reserve Report" and failed to disclose this subsequent report to the Lake Shore Harbour Community. "Instead, the Reserve Report, like the PEI report, was concealed by the Developer-controlled Board."

According to Lake Shore, "[o]nly when the Developer-controlled Board sought to assess the Subdivision" in 2019, "did the homeowners first learn that the Developer-controlled Board had known that there was something terribly wrong with the bulkheads and that these issues had not yet been addressed." At that time, the HOA Board informed the Lake Shore Harbour community that it would be assessed for fixing "significant problems" with the bulkhead system. This

apparently was the HOA Board's first effort to fix the bulkhead system and the first time the Subdivision's homeowners learned of any bulkhead issues.

Lake Shore alleges that when individual homeowners raised questions about their own properties prior to 2019, the HOA Board "concealed their knowledge of the significant construction defects" and "intentionally misrepresented material facts in an effort to conceal the true nature of the bulkhead defects," subsequently giving "homeowners the impression that the Board was actively working to remedy such issues." "In response to continued pressure from homeowners," Lake Shore alleges that the "Developer-controlled Board finally made the PEI Report available through the HOA website on August 5, 2019."

Given the "alarming information contained in the PEI Report," Lake Shore alleges that the homeowners formed a "Bulkhead Committee" and retained Tolunay Engineering Group ("TEG") "to assess the bulkhead issues and provide and engineering proposal." In September 2020, TEG submitted its report to the HOA Board concluding, among other things, that "the problems with the bulkheads arose from deficiencies related to their design and construction." In July 2021, based on the findings in the TEG report, Mason Construction, LLC issued a quote to the HOA Board estimating that the cost of replacing the bulkheads would be "approximately $23,000,000.00."

6

## C. Rivas and the Special Meeting of the Board

Saratoga Homes is the real estate development company and homebuilder for the Subdivision. Rivas is an Area Manager for the South Division of Saratoga Homes. Lake Shore alleges that in April 2017, "Rivas was elected to serve as a Director on the Developer-controlled Board."[3] According to Lake Shore, Rivas "also served as the Vice President of the Board in 2019."

On March 2, 2020, the HOA board held a special meeting to "discuss the TEG Report" ("Special Meeting"), at which Rivas was present. Lake Shore alleges that when asked at that meeting if he knew about the problems with the bulkhead system, Rivas responded that "he and his company Saratoga Homes, had been aware of the issues but stated that this information was not being disclosed to new or prospective homeowners." Lake Shore's pleadings identify no other statement made by Rivas at the Special Meeting.

## D. The Lake Shore Lawsuit

In 2021, Lake Shore sued several individual and corporate entities asserting claims for negligence, negligent misrepresentation, fraud and fraudulent misrepresentation, breach of fiduciary duty, constructive fraud, breach of contract,

---

[3] In its appellate brief, Lake Shore claims that Rivas was a Director and Vice President of the HOA Board from 2017 to 2019.

and breach of restrictive covenant.[4]  Lake Shore asserted claims against Rivas for negligent misrepresentation, fraud, fraudulent misrepresentation, and constructive fraud.

Lake Shore alleged that Rivas negligently and falsely represented to the homeowners that the Subdivision "was built in a good and workmanlike manner, free of any substantial defects."  It alleged that as "a Director of the HOA Board, Rivas was aware of the bulkhead issues but failed to use reasonable care in communicating such information to homeowners."  Lake Shore further alleged that "homeowners justifiably relied on these representations when making the decision to purchase a home within the Subdivision."

Lake Shore also alleged that several of the named defendants committed fraud by failing "to disclose the information contained in the PEI Report as well as the information subsequently acquired."  It claimed they committed constructive fraud "through the prolonged nondisclosure, concealment, and false representations made to Lake Shore . . . . regarding the nature and extent of the issues with the bulkheads."  Lake Shore did not identify any specific actions taken by Rivas.  Instead, Lake Shore asserted its fraud allegations generally against several defendants.

---

4       Lake Shore later added claims against some of the corporate entities for breach of implied warranties.

8

Rivas filed a Motion to Dismiss ("Motion to Dismiss") the claims against him under Chapter 27 of the Texas Civil Practice and Remedies Code, also known as the Texas Citizens Participation Act ("TCPA"). *See* TEX. CIV. PRAC. & REM. CODE § 27.003. Rivas argued that because Lake Shore's legal action against him for "negligent misrepresentation, fraud/fraudulent misrepresentation, and constructive fraud" was "based solely on the alleged statement [Rivas] made at the Special Meeting" in March 2020, the TCPA required dismissal of the claims. Rivas argued that the claims against him related directly to his "exercise of the right of free speech" and that any "alleged statement made by [him] was in connection with a matter of public concern" because it concerned the bulkhead system and its deterioration, an issue of "very real concern among homeowners."

After Rivas filed his Motion to Dismiss, Lake Shore amended its petition to add a claim against Rivas for breach of fiduciary duty. Lake Shore alleged that "a fiduciary relationship existed between Lake Shore and . . . Rivas . . . regarding the operation and control of the Lake Shore Homeowners Association" and that Rivas breached his fiduciary duty "by denying homeowners access to bulkhead records, withholding material information, and failing to take actions responsive to the discovered defects." As part of its breach of fiduciary claim, Lake Shore also alleged that Rivas violated Texas Property Code Sections 209.005 and 209.0051(c) "by refusing to provide homeowners with access to the records and documents that

9

were requested and by failing to hold regular and special board meetings open to all homeowners."[5]

Rivas filed a Supplement to its Motion to Dismiss addressing Lake Shore's new claims against him. It argued that Lake Shore's "broad allegations" were "based on, related to, or [were] in response to" his and the HOA "Board's exercise of their right to associate" because the March 2, 2020 Special Meeting "is where the association met to discuss *fixing* the bulkheads."

Lake Shore filed a response to the Motion to Dismiss, arguing that its claims against Rivas were not brought in response to the exercise of his right to free speech. Lake Shore argued it was suing Rivas for his "concealment of the bulkhead issues from the homeowners while serving as Director, and later as Vice President, of the Developer-controlled Board." It also argued that its claims did not implicate Rivas' right of free speech or his right of association because none of his statements involved a matter of public concern. Finally, Lake Shore argued that its claims against Rivas were not based on his participation on the HOA Board, and thus, the claims were not based on Rivas' right of association.

Rivas replied arguing that his alleged statements concerned a matter of public concern because they involved the possible collapse of the bulkhead system

---

[5]     Lake Shore does not appear to advance a separate claim for violation of the Texas Property Code. Instead, it appears Lake Shore alleges Rivas committed these alleged violations in support of its breach of fiduciary claim against Rivas.

10

around the lakes, which is an issue of "very real concern among homeowners." Rivas further claimed that Lake Shore's claims "impinge[d] on his right of association" because but for his association with the Lake Shore Board of Directors, the claims against him would not exist.

After a hearing, the trial court denied Rivas' Motion to Dismiss. This interlocutory appeal ensued.[6]

**Discussion**

**A.    Standard of Review and Applicable Law**

The Texas Citizens' Participation Act "is a bulwark against retaliatory lawsuits meant to intimidate or silence citizens on matters of public concern." *Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 376 (Tex. 2019). The TCPA is intended "to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits." *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) (orig. proceeding). The TCPA's purpose "is to 'encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file

---

[6]    *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(12) (granting right of interlocutory appeal from order denying motion to dismiss filed under TCPA).

11

meritorious lawsuits for demonstrable injury.'"[7] *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (quoting TEX. CIV. PRAC. & REM. CODE § 27.002). We construe the TCPA liberally to effectuate its purpose and intent. *Id.*

The TCPA enables a party who claims a legal action was filed in response to its exercise of a constitutionally protected right to seek dismissal of the underlying action, attorney's fees, and sanctions at an early stage in the litigation. *See* TEX. CIV. PRAC. & REM. CODE §§ 27.003, .005, .009(a); *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 132 (Tex. 2019); *Gaskamp v. WSP USA, Inc.*, 596 S.W.3d 457, 469–70 (Tex. App.—Houston [1st Dist.] 2020, pet. dism'd). The TCPA is applicable if the plaintiff's legal action "is based on or is in response to" the defendant's exercise of "(A) the right of free speech, (B) the right to petition, or (C) the right of association." TEX. CIV. PRAC. & REM. CODE § 27.005(b); *Lipsky*, 460 S.W.3d at 586–87.[8] A "legal action" can comprise a petition, counterclaim, single cause of action, or an entire lawsuit. *See* TEX. CIV. PRAC. & REM. CODE § 27.001(6); *Creative Oil & Gas*, 591 S.W.3d at 131.

---

[7] The TCPA is "considered to be anti-SLAPP legislation. SLAPP stands for Strategic Lawsuit Against Public Participation[.]" *In re Lipsky*, 411 S.W.3d 530, 536 n.1 (Tex. App.—Fort Worth 2013, no pet.) (citation omitted).

[8] The Texas Legislature amended the TCPA effective September 1, 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 1–12 (codified at TEX. CIV. PRAC. & REM. CODE §§ 27.001–.010). Because this suit was filed after the effective date of the amendments, all citations to the TCPA in this opinion refer to the amended statute.

To seek dismissal under the TCPA, a movant must first establish by a preponderance of the evidence "that the conduct forming the basis of the legal action filed against the movant falls within the purview of the TCPA." *Panton Inc. v. Bees360, Inc.*, No. 01-20-00267-CV, 2021 WL 3868773, at *4 (Tex. App.— Houston [1st Dist.] Aug. 31, 2021, no pet.) (mem. op.). Rivas sought dismissal of Lake Shore's claims against him arguing the claims were filed in response to the exercise of his right to free speech and right of association. Rivas must thus establish, by a preponderance of the evidence, that Lake Shore's lawsuit "is based on or is in response to" his exercise of the right of free speech or free association. TEX. CIV. PRAC. & REM. CODE § 27.003; *Panton*, 2021 WL 3868773 at *4. Both the exercise of the right of free speech and the exercise of the right of association must relate to a "matter of public concern" to fall within the purview of the TCPA. TEX. CIV. PRAC. & REM. CODE § 27.001(2), (3).[9]

If the movant makes this initial showing, the burden then shifts to the nonmovant to establish "by clear and specific evidence a prima facie case for each essential element" of its claims. *Panton*, 2021 WL 3868773 at *4 (citing TEX. CIV.

---

[9] The 2019 amendment to the TCPA narrowed the scope of the statute. The amended version of the statute omitted the phrase "relates to" from the TCPA. Thus, we now consider the narrower question of whether Lake Shore's claims were "based on or in response to" the TCPA protected rights of free speech and association. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 2–3, 2019 Tex. Sess. Law Serv. 684, 685 (noting removal of "relates to" in sections 27.003(a) and 27.005(b) in the 2019 amendments).

PRAC. & REM. CODE § 27.005(c)); *Lipsky*, 460 S.W.3d at 586–87. If the nonmovant establishes a prima facie case for each element of its claims, the burden shifts back to the movant to establish by a preponderance of the evidence each essential element of a valid defense. *Id.* (citing TEX. CIV. PRAC. & REM. CODE § 27.005(d)).[10]

If the nonmovant establishes that one of the TCPA's exemptions apply, it can avoid the burden-shifting analysis. *Id.* (citing TEX. CIV. PRAC. & REM. CODE § 27.010(b)).[11] If the movant is successful and the court orders dismissal, the court "shall award to the moving party court costs and reasonable attorney's fees incurred in defending against the legal action." TEX. CIV. PRAC. & REM. CODE § 27.009(a)(1).

We review de novo a trial court's ruling on a motion to dismiss filed under the TCPA. *Porter-Garcia v. Travis Law Firm, P.C.*, 564 S.W.3d 75, 83 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *Schlumberger Ltd. v. Rutherford*, 472 S.W.3d 881, 892 (Tex. App.—Houston [1st Dist.] 2015, no pet.). In our

---

[10]    A "prima facie case" requires evidence that is "sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 54 (Tex. 2021). It refers to "the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.*

[11]    The applicability of an exemption is waived if not raised in the trial court. *Thoman v. Roofing Contractors Ass'n of Tex.*, No. 03-19-00476-CV, 2020 WL 3526352, at *3 (Tex. App.—Austin June 30, 2020, no pet.) (mem. op.); *Elite Auto Body LLC v. Autocraft Bodywerks, Inc.*, 520 S.W.3d 191, 206 n.75 (Tex. App.—Austin 2017, pet. dism'd).

review, we view the evidence and the pleadings in the light most favorable to the nonmovant. *Dolcefino v. Cypress Creek EMS*, 540 S.W.3d 194, 199 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Cheniere Energy, Inc. v. Lotfi*, 449 S.W.3d 210, 214 (Tex. App.—Houston [1st Dist.] 2014, no pet.). In so doing, we "favor[] the conclusion that [the nonmovants'] claims are not predicated on protected expression." *Union Pacific R.R. Co. v. Dorsey*, 651 S.W.3d 692, 695 (Tex. App.—Houston [14th Dist.] 2022, no pet.).

## B.     Right of Free Speech

Rivas argues the trial court erred in denying his Motion to Dismiss because Lake Shore's legal action against him implicates his right of free speech. He claims that Lake Shore's "claims for negligent misrepresentation, fraud/fraudulent misrepresentation, breach of fiduciary duty, and constructive fraud are based on or in response to statements [] Rivas allegedly made regarding the state of the lake bulkheads during a 'Special Meeting of Lake Shore's Board of Directors on March 2, 2020." Lake Shore responds that it is not suing Rivas for statements he made, but rather for his conduct in concealing "known information about the deteriorating bulkheads from the Lake Shore community." It further argues that Rivas' statement at the Special Meeting was not made in connection with a matter of public concern because the statement "only affected the Lake Shore homeowners."

15

The TCPA defines "exercise of the right of free speech" as a "communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE § 27.001(3). A communication requires the "making or submitting of a statement or document in any form or medium." *Id.* § 27.001(1). A "matter of public concern" is defined as "a statement or activity regarding: (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." *Id.* § 27.001(7).

Lake Shore filed claims against Rivas for negligent misrepresentation, fraud and fraudulent misrepresentations, constructive fraud, and breach of fiduciary duty. In his Motion to Dismiss, Rivas argued that "[t]he entirety of [Lake Shore's] claims against [Rivas] [were] based on statements that he allegedly made to the homeowners of the Lake Harbour [sic] Community Subdivision regarding the design and condition of the bulkheads surrounding three man-made lakes located within the Subdivision."

Lake Shore asserted several claims against Rivas related to the bulkhead system and his alleged failure to disclose the condition of the bulkheads to the Lake Shore Harbour Community. While Rivas contends that Lake Shore's claims are premised on Rivas' alleged protected communications, Lake Shore's pleadings

16

reflect that is not the case. Lake Shore alleges that Rivas committed negligent misrepresentation by

> negligently and falsely represent[ing] to homeowners that the Subdivision was built in a good and workmanlike manner, free of any substantial defects. Rick Rivas was aware of bulkhead issues but failed to use reasonable care in communicating such information to homeowners. Further, homeowners justifiably relied on these representations when making the decision to purchase a home within the Subdivision. As a result, homeowners suffered injury and substantial damages.

With respect to its fraud, fraudulent misrepresentation, and constructive fraud claims, Lake Shore alleged that:

> Defendants failed to disclose the information contained in the PEI Report as well as the information subsequently acquired. By concealing this information from Lake Shore, who did not have an equal opportunity to discover the truth, Lake Shore was deprived of any opportunity to take action to repair or otherwise remedy the bulkhead issues. As a result, Lake Shore has suffered injury and substantial damages.

> . . .

> Defendants made representations to Lake Shore in the course of business transactions which Defendants had a pecuniary interest and did not exercise reasonable care or competence in obtaining or communicating material information. Thus, Defendants committed constructive fraud through the prolonged nondisclosure, concealment, and false representations made to Lake Shore, with which it had a fiduciary relationship, regarding the nature and extent of the issues with the bulkheads.

And in support of its breach of fiduciary duty claim, Lake Shore alleged that "a fiduciary relationship existed between Lake Shore and . . . Rivas . . . regarding the

17

operation and control of the Lake Shore Homeowners Association" and that Rivas breached his fiduciary duties "by denying homeowners access to bulkhead records, withholding material information, and failing to take actions responsive to the discovered defects." As part of its breach of fiduciary duty claim, Lake Shore also alleged that Rivas violated Sections 209.005 and 209.0051(c) of the Texas Property Code "by refusing to provide homeowners with access to the records and documents that were requested and by failing to hold regular and special board meetings open to all homeowners."

According to Lake Shore's pleadings, when asked at a March 2020 Special Meeting of the Board if he knew about the "bulkhead issues," Rivas "indicated that he and his company Saratoga Homes[] had been aware of the issues but stated that this information was not being disclosed to new or prospective homeowners."[12] It is this alleged failure to disclose known information about the "bulkhead issues" to the Lake Shore Harbour community that gives rise to Lake Shore's claims against Rivas, not the statement itself. As Lake Shore argues, Rivas' statement made during the Special Meeting is merely evidence of Rivas' alleged knowledge of the bulkhead issues and his failure to disclose information he possessed to the Lake Shore Harbour community. Indeed, Lake Shore's pleadings are replete with allegations concerning what Rivas *failed* to say or do: "Rick Rivas was aware of

---

[12]     Lake Shore does not identify any other statements made by Rivas in its pleadings.

18

bulkhead issues but failed to use reasonable care in communicating such information to homeowners;" "Defendants failed to disclose the information . . . .;" "Rivas . . . refus[ed] to provide homeowners with access to the records and documents that were requested and [] fail[ed] to hold regular and special board meetings open to all homeowners;" Rivas "den[ied] homeowners access to bulkhead records, with[eld] material information, and fail[ed] to take actions responsive to the discovered defects;" and Defendants engaged in "the prolonged nondisclosure, concealment, and false representations made to Lake Shore."

Based on these allegations, we conclude that Lake Shore's claims against Rivas are not based on or in response to his protected communications, but rather his alleged conduct in failing to disclose known information about the bulkhead system and its alleged deterioration. Appellate courts, including our Court, "have declined to rewrite the TCPA to extend the definition of 'communication' to include [a failure] to communicate." *Union Pacific R.R. Co. v. Chenier*, 649 S.W.3d 440, 448 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) (citing *Sanchez v. Striever*, 614 S.W.3d 233, 246 (Tex. App.—Houston [14th Dist.] 2020, no pet.) and *Krasnicki v. Tactical Entm't, LLC*, 583 S.W.3d 279, 284 (Tex. App.—Dallas 2019, pet. denied)). "The definition of 'communication' makes no reference to the withholding of a statement or document." *Krasnicki*, 583 S.W.3d at 284; *see also SSCP Mgmt. Inc. v. Sutherland/Palumbo, LLC*, No. 02-19-00254-

19

CV, 2020 WL 7640150, at *3 (Tex. App.—Fort Worth Dec. 23, 2020, pet. denied) (mem. op. on reh'g) (observing that TCPA's definition of communication "does not include a failure to communicate"). As our sister court observed, "construing the definition of 'communications' to include non-communications would lead to an absurd result as nothing would be outside the scope of the TCPA." *Krasnicki*, 583 S.W.3d at 284.

*Union Pacific v. Chenier*, 649 S.W.3d 440 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) is instructive. That case stemmed from actions brought by Betty Chenier and a dozen other plaintiffs who alleged the railroad failed to warn them adequately about contaminants in the soil and groundwater from the railroad's facilities, causing them personal injuries and property damage. *Id.* at 442. The plaintiffs alleged they were residents of two Houston neighborhoods that housed a railroad plant where wood railroad ties were treated with creosote, a carcinogen. *Id.* at 443. Even after Union Pacific stopped using creosote "because of safety concerns" in the 1980s, it did not remove the creosote waste from the plant. *Id.* An investigation by the Texas Commission on Environmental Quality revealed the soil, air, and water in the neighborhoods had been contaminated, causing property and personal injury damages, including cancer, to the plaintiffs and others. *Id.* The plaintiffs sought more than $50 million in damages, asserting "Union Pacific was aware of the risks associated with the exposure to creosote and other toxic

20

contaminants and it failed to disclose such risks to the plaintiffs, which caused property damage and personal injuries." *Id.* Union Pacific filed a TCPA motion to dismiss the plaintiffs' property damage claims for negligence, negligence per se, negligent misrepresentation, and nuisance.[13] *Id.* at 444. The railroad asserted the plaintiffs' claims were based on or in response to its exercise of free speech and right to petition. *Id.* The trial court denied Union Pacific's motion to dismiss. *Id.*

On appeal, Union Pacific asserted the plaintiffs' claims impinged on its right to free speech because the claims involved communications about matters of public concern and because the plaintiffs alleged the railroad "continued to represent to community residents that there was no threat of contamination or human exposure" to the contaminants. *Id.* at 446. This Court concluded Union Pacific did not satisfy its burden of establishing the suit was based on or in response to its exercise of free speech because

> The crux of the plaintiffs' allegations was that Union Pacific concealed information and "communicated too little" about the creosote waste and other toxic contaminants. The plaintiffs sued Union Pacific for claims based on or in response to Union Pacific's failure to adequately warn them of the known dangers associated with the toxic chemicals discharged from its facility. Stated simply, the plaintiffs primarily complained about Union Pacific's conduct, not speech.

---

[13] Union Pacific did not seek to dismiss the fraud claims or personal injury claims. *Union Pacific R.R. Co. v. Chenier*, 649 S.W.3d 440, 444 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). *See* TEX. CIV. PRAC. & REM. CODE § 27.010(a)(3), (12) (exempting from TCPA dismissal legal actions seeking injuries for bodily injury or based on common law fraud).

*Id.* at 447. We held there was only a "tenuous nexus" between the alleged communication by Union Pacific and the plaintiffs' negligence and nuisance claims. *Id.* Thus, we affirmed the trial court's denial of Union Pacific's motion to dismiss.

Similarly, in another case involving Union Pacific's alleged contamination of "residential neighborhoods" with creosote, the Fourteenth Court of Appeals held a global allegation based on a "failure to disclose–a failure to communicate–[] does not implicate protected activity." *Dorsey*, 651 S.W.3d at 698 ("[T]he gravamen of these claims is Union Pacific's contamination of Houston neighborhoods with creosote and Union Pacific's failures to communicate regarding the scope and dangers of the contamination.")[14]; *see also Kinder Morgan SACROC, LP v. Scurry Cnty.*, No. 11-21-00205-CV, 2022 WL 120803, at *8 (Tex. App.—Eastland Jan. 13, 2022, no pet.) (mem. op.) (stating "claims based on the alleged failure to disclose or failure to communicate are not subject to the TCPA"); *Elite Auto Body LLC v. Autocraft Bodywerks, Inc.*, 520 S.W.3d 191, 207 (Tex. App.—Austin 2017, pet. dism'd) (holding district court did not err in denying TCPA motion to dismiss

---

[14] In *Dorsey*, the court of appeals reversed a portion of the trial court's order denying a TCPA motion to dismiss a negligent misrepresentation claim brought by certain plaintiffs. *Union Pacific R.R. Co. v. Dorsey*, 651 S.W.3d 692, 702 (Tex. App.—Houston [14th Dist.] 2022, no pet.). The remainder of the trial court's order, which denied the TCPA motion brought with respect to negligence, negligence per se, fraudulent concealment, and nuisance claims, was affirmed. *Id.*

because claims were "predicated factually on conduct by appellants that [did] not constitute 'communications' as defined by the TCPA").[15, 16]

Consistent with our opinion in *Cheniere*, we hold that Rivas did not satisfy his burden to establish that Lake Shore's legal action against him is based on or in response to his exercise of free speech. The crux of Lake Shore's allegations against Rivas concern his alleged failure to disclose known information about the bulkhead system to the Lake Shore Harbour community and thus the legal action concerns his conduct and not his speech. In the absence of a communication giving rise to a legal action, there can be no TCPA protection of Rivas' right to free speech.

## C.    Right of Association

Rivas also argues the trial court erred in denying his Motion to Dismiss because Lake Shore's legal action against him is based upon or in response to his association with the HOA Board and thus the legal action impinges on his right of association. Lake Shore responds that it is not suing Rivas because of his position as Director on the HOA Board, but rather because of his "concealment of known

---

[15]    The definition of "communication" was not revised when the TCPA was amended.

[16]    Both parties discuss *Ngo v. Ass'n of Woodwind Lakes Homeowners, Inc.*, No. 01-18-00919-CV, 2020 WL 7391696, at *3 (Tex. App.—Houston [1st Dist.] Dec. 17, 2020) (mem. op.). After *Ngo* issued, the parties settled their dispute and the opinion was withdrawn and vacated. *Ngo v. Ass'n of Woodwind Lakes Homeowners, Inc.*, No. 01-18-00919-CV, 2022 WL 3970068, at *1 (Tex. App.—Houston [1st Dist.] Sept. 1, 2022, no pet.) (mem. op.). Therefore, we do not address it.

23

bulkhead issues." Lake Shore also argues that Rivas' association with the HOA Board "was not connected to a matter of public concern."

The TCPA defines "exercise of the right of association" as joining "together to collectively express, promote, pursue, or defend common interests relating to a governmental proceeding or a matter of public concern." TEX. CIV. PRAC. & REM. CODE § 27.001(2).[17] "Matter of public concern" is defined as a "statement or activity regarding: (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." *Id.* § 27.001(7).

---

[17] This Court has held that in the context of a TCPA claim, "common" necessarily includes a "public component" because the "express purpose of the TCPA [is] to protect constitutional rights, while at the same time protecting the rights of persons to file meritorious lawsuits for demonstrable injury." *Gaskamp v. WSP USA, Inc.*, 596 S.W.3d 457, 474 (Tex. App.—Houston [1st Dist.] 2020, pet. dism'd) (citing TEX. CIV. PRAC. & REM. CODE § 27.002). Although *Gaskamp* was decided based on the pre-amendment version of the TCPA, it discussed the amended version in the context of the right to public association:

> In amending the statute, the Legislature chose to define "common interests" in a manner . . . which determined that tortfeasors, conspiring and colluding for their own private financial gain, are not entitled to protection under the right of association. By limiting "common interests" to those interests related to government proceedings or matters of public concern (as defined in the amended statute), the Legislature clarified that the exercise of the right of association was never intended to include an alleged tortfeasor's acts taken in furtherance of private interests.

*Id.* at 475–76 (internal citations omitted).

24

Rivas argues that "Lake Shore's claims for negligent misrepresentation, fraud/fraudulent misrepresentation, breach of fiduciary duty, and constructive fraud are based on or in response to [] Rivas' alleged association with the Lake Shore Board of Directors," and that "but for that alleged association, Lake Shore's claims against Mr. Rivas would not exist." We disagree.

While Rivas contends that Lake Shore's legal action is based on his association with the HOA Board, we have already concluded that Lake Shore's claims are based on Rivas' alleged failure to act—his *conduct* in failing to disclose alleged problems with the bulkhead system to the Lake Shore Harbour community. That Lake Shore references Rivas' statements as evidence of the alleged concealment during his term as Director of the HOA Board does not turn Lake Shore's legal action into one based on Rivas' right of association. On the contrary, as Lake Shore argues, "[t]he mere fact that a homeowners association 'is a group of individuals who join together' to collectively express the common interests of the homeowners, does not mean that any claim involving a homeowners association is protected under the TCPA." *See BusPatrol Am., LLC v. Am. Traffic Sols., Inc.*, 05-18-00920-CV, 2020 WL 1430357, at *8 (Tex. App.—Dallas Mar. 24, 2020, pet. denied) (mem. op.) ("Construing the TCPA to find a right of association simply because there are communications between parties with a shared interest in a private business transaction does not further the TCPA's

purpose to curb strategic lawsuits against public participation."). If that were the case, all claims involving homeowners' associations would implicate the right of association under the TCPA. Here, as Lake Shore argues, it was not Rivas' association with the HOA Board or his communications made while on the Board that were problematic, but rather "his [alleged] prolonged concealment from the community" about the condition "of the bulkheads that caused Lake Shore's" alleged damages.

The four cases on which Rivas relies are distinguishable. First, each of the cited authorities rely on language from the less stringent pre-amendment version of the TCPA allowing dismissal of a legal action when the legal action "relates to" a TCPA protected right. *See, e.g., Roach v. Ingram*, 557 S.W.3d 203, 219 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("We conclude the Judicial Defendants have satisfied their statutory burden to show that the Parents' lawsuit is 'based on, *relates to*, or is in response to' the Judicial Defendants' exercise of the right to free speech concerning communications 'made in connection with a matter of public concern, namely, the enforcement of truancy laws and the operation of the Truancy Court, as well as the Judicial Defendants' exercise of the right of association . . . .") (emphasis added); *O'Hern v. Mughrabi*, 579 S.W.3d 594, 603 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (holding claim "is based on, *relates to*, or is in response to, appellants' exercise of their right of association")

26

(emphasis added); *Neyland v. Thompson*, No. 03-13-00643-CV, 2015 WL 1612155, *4 (Tex. App.—Austin Apr. 7, 2015, no pet.) (mem. op.) (concluding the record shows by a preponderance of the evidence that Appellee's suit against Appellants for defamation because of oral and written statements made to HOA members and statements made to a television reporter "is based on, *relates to*, or is in response to Appellants' right of association") (emphasis added); *Green v. Port of Call Homeowners Ass'n*, No. 03-18-00264-CV, 2018 WL 4100855, *9 n. 17 (Tex. App.—Austin Aug. 29, 2018, no pet.) (mem. op.) ("The TCPA applies to legal actions based on, *related to*, or in response to a party's exercise of the right of association.") (emphasis added).

The "tightening of the statutory language" under the amended version of the TCPA is significant, because it "restricts" and narrows TCPA protection. *ML Dev, LP v. Ross Dress for Less, Inc.*, 649 S.W.3d 623, 629 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). That is, the deletion of the phrase "relates to" from the statute effectively "removed the broadest category of connection, thereby requiring future TCPA movants to establish a closer nexus between the claims against them and the communications they point to as their exercise of protected rights." *Id.*; *see also Welsh v. River Hollow Ass'n*, 654 S.W.3d 505, 514 (Tex. App.—Houston [14th Dist.] 2022, no pet. h.) (distinguishing *O'Hern*, *Roach*, *Green*, and *Neyland* because they were "decided under the prior version of the statute that required the

27

claims to merely 'relate to' a communication between individuals who joined together, rather than to be 'based on' or 'in response to' a joining together").

Second, the cases Rivas cites are distinguishable. In *Roach*, for example, the TCPA movants were government officials who were sued in their official capacity for collective decision-making made while serving as members of a governmental juvenile board. 557 S.W.3d at 218–19. The "factual core" of the legal action in *O'Hern* concerned "oral remarks made in HOA meetings, written presentations, and notices of the decisions." 579 S.W.3d at 603. The claims at issue in *Neyland* concerned alleged defamatory statements made by members of a homeowners' association in emails to homeowners, flyers, a petition distributed to homeowners, oral statements made to homeowners, and oral statements made to a television reporter. 2015 WL 1612155 at *1. And in *Green*, the legal action was predicated on alleged defamatory statements made by members of a homeowners' association. 2018 WL 4100855 at *9. In each case, the plaintiff's allegations relied on affirmative statements, whereas in the present case, Lake Shore's claims are based on an alleged failure to communicate or disclose.

We thus hold that Rivas did not satisfy his burden to establish that Lake Shore's legal action against him is based on or in response to his right of association.

**D.    Matter of Public Concern**

Rivas also argues that his statements during the Special Meeting and his association with the HOA Board implicate his right of free speech and right of association because the "Lake Shore board joined together to 'express, promote, pursue, or defend common interests relating to . . . a matter of public concern'" and his communications during the meeting also concerned a matter of public concern. A matter of public concern is defined as a "*statement or activity* regarding: (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." TEX. CIV. PRAC. & REM. CODE § 27.001(7).

According to Rivas, the safety concerns of the Lake Shore community are a "matter of public concern" because more than 900 single-family homes are in the community; the three man-made lakes help with urban infrastructure; the lakes entice prospective homeowners; the deterioration of the bulkheads could cause damage to the neighborhood; the community may be assessed for fixing problems with the bulkheads; and the cost of replacing the bulkheads could cost Lake Shore and its homeowners more than $25 million. He claims that the very size of the Lake Shore Harbour community—more than 900 homes—and "whether the lakes were in disrepair or not" make the dispute a matter of public concern. Lake Shore

29

responds that a matter of public concern under the TCPA must have relevance "beyond the interests of the parties" and must be made "in connection with a health or safety issue that affects the general public."

We have already concluded that Lake Shore's legal action against Rivas does not implicate his right of association or right of free speech, because it was not his statement at the Special Meeting or his membership in the HOA Board that gave rise to Lake Shore's legal action, but rather his alleged failure to disclose the bulkhead issues to the Lake Shore Harbour community. A failure to disclose does not constitute a statement or an activity, either of which is required to "join[] together to collectively express, promote, pursue, or defend common interest relating to a . . . matter of public concern." *Id.* § 27.001(7) (defining "matter of public concern" as "statement or activity" regarding "a matter of . . . interest to the community" or "a subject of concern to the public"); *id.* § 27.001(2) (defining "right of association" as joining "together to collectively express, promote, pursue, or defend common interests relating to a governmental proceeding or a matter of public concern"). Thus, in the same way a failure to disclose cannot be the subject of a TCPA motion to dismiss based on the right to free speech, it cannot be the subject of a motion to dismiss based on the right of association. *See Dorsey*, 651 S.W.3d at 698 (citing *DOJO Bayhouse, LLC v. Pickford*, No. 14-20-00237-CV, 2021 WL 6050677, at *6 (Tex. App.—Houston [14th Dist.] Dec. 21, 2021, no pet.)

30

(mem. op.)[18]; *KIPP, Inc. v. Grant Me the Wisdom Found., Inc.*, 651 S.W.3d 530, 539 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (holding that "the failure to do something, standing alone, generally is not joining 'together to collectively express, promote, pursue, or defend common interests'").[19]

Again, the cases upon which Rivas relies are distinguishable. In *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890 (Tex. 2018) the developer of a neighborhood filed suit against Adams and his wife ("collectively, "Adams"), both of whom resided in the neighborhood. *Id.* at 892. The developer and Adams had a dispute over a common area in the subdivision. *Id.* The developer sued Adams "asserting claims for threat of imminent bodily injury and business disparagement" and seeking a declaratory judgment. *Id.* After Adams filed a TCPA motion to dismiss the business disparagement claim, the developer dropped the business

---

[18]    In *DOJO Bayhouse, LLC v. Pickford*, No. 14-20-00237-CV, 2021 WL 6050677, at *6 (Tex. App.—Houston [14th Dist.] Dec. 21, 2021, no pet.) (mem. op.), the appellate court concluded that "looking solely to the petition," the appellant's "articulated claims are not based on, related to, or in response to [the appellee's] exercise of any TCPA-protected right because [the appellant] did not allege that [the appellee] made a communication . . . ." Although *DOJO* was decided based on the old version of the statute, we find it illustrative to the extent it holds that a TCPA-protected right is contingent on a communication.

[19]    Rivas asserts that Lake Shore "seek[s] to avoid the requirements of the TCPA by asserting that their complaints are about another's 'conduct' rather than TCPA-protected communications." The issue here is not whether conduct is actionable. Rather, the issue is whether the failure to act or communicate is actionable. Indeed, one of the cases Rivas relies on held that extending "the reach of the TCPA [] to noncommunications" would be "contrary to the plain-language definitions in the TCPA." *Smith v. Crestview NuV, LLC*, 565 S.W.3d 793, 798 (Tex. App.—Fort Worth 2018, pet. denied).

disparagement claim and added a claim for defamation. *Id.* The developer's pleadings alleged that Adams had defamed the developer in a blog and in an email sent to the HOA president and others. *Id.* at 893. Adams filed a supplemental motion to dismiss the defamation claim under the TCPA. *Id.* The trial court did not rule on the motion to dismiss the defamation claim within the statutory period and thus the motion was denied by operation of law. *Id.* at 894.

The reviewing court affirmed, holding, among other things, that Adams had not established that the developer's defamation claim was "based on, relate[d] to, or is in response to [Adams'] exercise of . . . the right of free speech." *Id.* The court of appeals "reached only the issue of whether Adams [had] established under section 27.005(b) that his defamation claim" was "based on, relate[d] to, or in response" to Adams' right of free speech and "did not reach the merits of Adams' argument that his statements related to community well-being." *Id.*

Reversing the intermediate court, the Supreme Court held that the alleged defamatory communications in the blog and the email "raise[d] 'issues related to' [the developer's] products or services in the marketplace as a homebuilder and neighborhood developer." *Id.* at 894. The Court noted that the blog "raise[d] 'issues related to' services in the marketplace" by complaining about the development and management of the subdivision and that the email also raised "issues related to [the developer's] services as a neighborhood developer." *Id.* at

894–95. The Supreme Court also held that the allegedly defamatory comments related to "an issue related to . . . environmental, economic, or community well-being," because the allegations suggested the homeowners' association had "not follow[ed] city ordinances on tree preservation." *Id.* at 895–96

In *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 901 (Tex. 2017) the Supreme Court held that communications about Coleman, a former ExxonMobil Pipeline Company ("ExxonMobil") employee who allegedly failed to "gauge" a storage tank but reported that he did so, were "made in connection with a matter of public concern."[20] *Id.* at 897. After Coleman was terminated, he sued his former employer and supervisors for defamation. *Id.* He claimed that statements made about his termination were untrue because he had gauged the tank at issue and because, contrary to his supervisor's statement, there were documents to support his version of the incident. *Id.* ExxonMobil filed a TCPA motion to dismiss. The court of appeals held ExxonMobil did not establish the TCPA applied to the suit. *Id.* The Supreme Court reversed, holding that "[t]he statements, although private and among [ExxonMobil] employees, related to a 'matter of public concern' because they concerned [a former employee's] alleged failure to gauge tank 7840, a process completed, at least in part, to reduce the

---

[20] Coleman was assigned to perform preventative maintenance, "offload shipments from incoming trucks, and record the fluid volume of various petroleum products and additives in storage tanks each night." *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 897 (Tex. 2017). The process is called "gauging the tanks." *Id.*

33

potential environmental, health, safety, and economic risks associated with noxious and flammable chemicals overfilling and spilling onto the ground." *Id.* at 901. The Court observed that "the challenged statements constitute speech the Legislature intended to safeguard through the TCPA" because they were either oral, written, or electronic. *Id.*[21]

*Adams* and *Coleman* involved the former version of the TCPA, which applied a less exacting standard and included a broader definition of the phrase a "matter of public concern." The amended statute no longer defines a "matter of public concern" to include an issue related to "environmental, economic, or community well being."[22] Moreover, unlike *Adams* and *Coleman*, the claims here do not involve defamatory statements or statements at all. As we have already concluded, the claims against Rivas arise from his alleged conduct in failing to disclose problems with the bulkhead system. And they concern Rivas' alleged

---

[21]     The Supreme Court did not express an opinion on whether the communications "were made in the exercise of the right of association under the TCPA." *Id.* at 902.

[22]     The definition of "public concern" changed in the amended version. *See* TEX. CIV. PRAC. & REM. CODE § 27.001(2). The 2019 amendment defines "matter of public concern" as "a statement or activity regarding: (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 1, sec. 27.001(7), 2019 TEX. SESS. LAW SERV. 684, 685. Previously, a "matter of public concern" was defined as "an issue related to health or safety; environmental, economic, or community well-being; the government; a public official or public figure; or a good, product, or service in the marketplace."

knowledge of the bulkhead issues, not his opinion or concern regarding such matters.

We thus hold that Rivas did not satisfy his burden to establish that Lake Shore's legal action against him is based on or in response to his right of association or his right to free speech.[23]

We overrule Rivas' first issue.[24]

## Conclusion

We affirm the trial court's order denying Rivas' TCPA motion to dismiss.


Veronica Rivas-Molloy
Justice


Panel consists of Chief Justice Adams and Justices Countiss and Rivas-Molloy.

---

[23] Because we conclude there is no "statement or activity" giving rise to Lake Shore's legal action against Rivas, we do not address whether the issues involved concern "(B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." *See* TEX. CIV. PRAC. & REM. CODE § 27.001(7).

[24] Given our disposition, we need not address Rivas' second issue that the trial court erred in denying his request for attorney's fees.

35